JOSEPH D. BONANOMI, Appellant, v. WILLIAM
PURCELL et al.

JOSEPH D. BONANOMI v. WILLIAM PURCELL
et al.; WILLIAM PURCELL, appellant.

Division One, April 9, 1921.

1. **APPEAL.** An appeal cannot be taken from an order overruling plaintiff's motion for a new trial and to set aside an involuntary nonsuit taken by him as to a certain defendant. Such an order is not a final judgment.

2. **CONTRIBUTORY NEGLIGENCE.** Even where the defendant is guilty of acts of negligence which furnish the opportunity of plaintiff's injury, still if plaintiff is guilty of reckless acts which are the immediate cause of his injury he cannot recover damages for it.

3. **COMMERCIAL INTERCOURSE: Invitation to Enter Premises: Necessary Care.** One merchant dealing with another has a right to go upon the premises of the latter by virtue of the invitation implied from commercial intercourse, and the latter assumes to use ordinary care for the safety of his visitor. This degree of care is measured by the standard of the statutes as well as the common law. If some of the precautions prescribed by them are neglected, it is still incumbent upon the visitor to give ordinary care and attention to his own safety as affected by the conditions which lie openly before him, and this care is also measured by the law.

4. ———: ———: ———: **Case Adjudged.** Defendant occupied a store at the corner of two streets, with a main entrance from one street at the first floor, and another entrance from the other street leading into the basement of the building. The plaintiff, a business man of large experience and familiar with such establishments, called upon defendant at his store to negotiate an arrangement for the removal of certain leather in rolls belonging to plaintiff's firm which was in this store. Defendant consented to the arrangement and invited the plaintiff to go down into the basement where the leather was kept. Plaintiff, defendant and an employee went together, descending by an elevator. At the basement floor they alighted, leaving the elevator standing in the shaft. There were no lights in either the elevator or the basement, and the place was

very dark. The entrance to the elevator shaft at this floor was provided with a double door, one-half of which was gone, so that there was an open space about two feet wide looking into the shaft and wholly unguarded. A city ordinance required this shaft to be guarded and the elevator to be lighted. When the party left the elevator, defendant opened the door leading to the side street and plaintiff then took his stand on the street in the daylight and received and counted the rolls of leather as they were brought out of the basement. Defendant left him thus engaged, went out through the side door, up the sidewalk, and around the corner of the building, a total distance of about fifty feet, to the main entrance to the first floor. Plaintiff remained at his work until it was completed, about an hour and a half, when he said to the employee, "Let's go up stairs," and without waiting for an answer walked out of the light into the basement and toward the elevator shaft where it was so dark that only a dim outline of the shaft could be seen, but he did see the two-foot opening out of which they had come when they descended. Without any invitation to enter or appearance to indicate that the elevator was still standing where they had left it an hour and a half before, he walked into the shaft and fell to the bottom, ten or twelve feet below. *Held*, that he could not recover for the consequent injuries.

Appeal from St. Louis City Circuit Court.—*Hon. Moses Hartmann*, Judge.

REVERSED AND REMANDED.

*Jones, Hocker, Sullivan & Angert* and *Ernest A. Green* for plaintiff.

The trial court did not err in granting plaintiff a new trial and setting aside the involuntary nonsuit as to defendant William Purcell. The plaintiff was not guilty of contributory negligence as a matter of law. That question was for the jury. Grote v. Hussmann, 223 S. W. 131; Noack v. Williams, 175 Mich. 15; Barfoot v. White Star Line, 170 Mich. 349; Colorado Inv. Co. v. Reeves, 21 Colo. 435; Dawson v. Sloan, 17 Jones & S. (N. Y. Sup. Ct.) 304, 100 N. Y. 620; Wright v. Perry, 188 Mass. 268; Graney v. St. Louis, 141 Mo. 184; Stephens v. Eldorado Springs, 185 Mo. App. 469; Morris v. Rail-

road, 184 Mo. App. 113; Chase v. Railway, 134 Mo. App. 657; Atlanta Terminal Co. v. Johnson, 15 Ga. App. 22; Cadneau v. Railroad, 161 Mass. 355; Jolliffe v. Miller, 126 App. Div. 763, 111 N. Y. Supp. 406, 196 N. Y. 504; Wilcox v. Rochester, 190 N. Y. 1371; Shaninger Co. v. Mann, 219 Ill. 242; Loan & Trust Co. v. Jester, 180 Ind. 357; Conway v. Trust Co., 47 Mont. 269.

*Thomas L. Anderson* for defendant Purcell.

(1) Plaintiff was guilty of contributory negligence as a matter of law. Marshall v. United Rys. Co., 209 S. W. 931; Cluett v. Union Electric L. & P. Co., 205 S. W. 73; State ex rel. v. Ellison, 271 Mo. 463; Nolan v. Shickle, 69 Mo. 336; Powell v. Railway, 76 Mo. 83; 29 Cyc. 508; 2 Words and Phrases, 1545; Steger v. Immen, 122 N. W. 104, 24 L. R. A. (N. S.) 247; Ballou v. Collomore, 160 Mass. 246. (2) Where a person having a choice of two ways, one of which is perfectly safe and the other of which is subject to risk and dangers, voluntarily chooses the latter and is injured, he is guilty of contributory negligence and cannot recover. Behre v. Hempe, 191 S. W. 1038; Bailey on Personal Injuries, secs. 1121, 1123; Shaw v. Goldman, 116 Mo. App. 332; Rogers v. Packing Co., 185 Mo. App. 109; 3 Labatt's Master and Servant, sec. 1249, p. 3432.

*Buder & Buder, E. E. Schowengerdt* and *A. W. Wenger* for defendant Gregg.

(1) No appeal lies from an order overruling motion for new trial as such. R. S. 1909, sec. 2038; Lowe v. Frede, 258 Mo. 208; Lowe v. Frede, 151 Mo. App. 569; Sperling v. Stubblefield, 83 Mo. App. 266. (2) No appeal lies from an order overruling motion to set aside involuntary nonsuit. R. S. 1909, sec. 2038; Boggess v. Cox, 48 Mo. 278; Lyons v. Rollinson, 109 Mo. App. 68; Conn v. Ferree, 60 Mo. 17; Sperling v. Stubblefield, 83 Mo. App. 266; Broyles v. Cooperage Co., 208 S. W. 122.

BROWN, C.—This is a suit against appellant Purcell
as tenant and occupant, and his co-defendant Gregg as
owner, of a building in the City of St. Louis, for person-
al injuries sustained by plaintiff in falling into an eleva-
tor shaft in said building. The petition charged that
while the plaintiff was in the basement of the building
for and engaged in the transaction of business with the
tenant, he stepped into an open and unguarded elevator
shaft and fell about twelve feet, receiving serious and
permanent injuries. The petition contains five assign-
ments of negligence, three of which were based upon
common-law duties and two upon violation of certain
ordinances of the city. The first three charge that the
elevator shaft was negligently and carelessly left by de-
fendants open, unguarded and without any guardrails
or enclosure whatever around it, and that there were no
lights in the basement to indicate the open and un-
guarded condition of the shaft, all of which conditions
existed at the time Gregg leased the premises to Purcell.
The fourth and fifth assignments were founded respect-
ively upon two paragraphs of Section 2183 of the Revised
Code of the City of St. Louis which are as follows:

"Paragraph 22. Lights.—A light shall be provided
in all passenger and freight elevators.

"Paragraph 30. Every open hatchway in which a
freight elevator is installed shall hereafter be securely
protected on all sides to a height of at least six feet—
said enclosure may be solid or constructed of two and
one-half inch mesh wire of at least number eleven gauge,
or of vertical or horizontal strips. If vertical strips are
used, the open space between strips shall not exceed two
and one-half inches. The entrance to the shaft shall
be provided with a semiautomatic gate at least five feet
in height, properly fitted with a device to prevent the
gate from being opened until the platform of the car ar-
rives at the floor landing, and which shall cause the gate
to close automatically as the car leaves the floor landing."

The petition charged that defendants had violated
all the provisions of both city ordinances and that from

the time of leasing up to the time of the accident neither the light nor the enclosures or the gates required thereby had been installed in the said shaft, whereby and in consequence of all said negligent acts and omissions the plaintiff was injured as stated.  Damages were laid and asked in the sum of $10,000.

Each of the separate answers of the defendants consisted of a general denial and plea of contributory negligence.

After hearing the evidence the court, upon motion of each of the defendants, gave instructions to find for each of them, whereupon the plaintiff took a nonsuit with leave to move to set the same aside and in due time filed such motion, which was sustained as to the defendant Purcell and overruled as to Gregg.

Purcell takes this appeal from the order of the trial court sustaining, as against him, the motion to set aside the nonsuit, and granting a new trial.

Plaintiff appeals from the order overruling his similar motion as to Gregg.

It will be seen from the foregoing statement that the only question for our determination in Purcell's appeal is whether or not the evidence against him was sufficient to make a case for the jury.

Respondent Gregg has filed his motion to dismiss plaintiff's appeal on the ground that no final judgment was entered upon the nonsuit suffered by plaintiff as against Gregg, and that the order overruling the motion to set aside the nonsuit as against him is not a judgment or order from which an appeal lies.

These appeals have been consolidated in this court and tried as one case, and will be so treated in this opinion.

The appellant Purcell was a harness manufacturer in St. Louis, doing business in a building at the southeast corner of Main and Market Streets.  The plaintiff was a credit man for the Armour Leather Company, who sold him leather for use in his industry.  Some question arose as to his ability to pay for leather on hand

in his factory purchased from the Armour Company on credit. The matter came to the hands of Mr. Bonanomi, who arranged with Mr. Purcell that the leather might be removed from the factory at Main and Market streets to an Armour warehouse, to be held for him, and released from time to time as paid for. Mr. Bonanomi, on the day of the accident (April 23, 1918), went to the factory for that purpose. Mr. Purcell's office was on the first floor. The leather was in the basement, ten feet below, reached by an inside stairway, which reached the floor of the basement about ten feet from the shaft of the freight elevator which came from the floors above down into the basement. The stair landing was about midway between the elevator and the street door of the basement.

The elevator shaft in the basement was enclosed on three sides. On the side toward the room it had apparently been enclosed by double swinging doors, one of which was gone, leaving an open space of half the width of the shaft, say about two feet.

The leather was in the basement. After the arrangement for removing it had been made in the office, Mr. Purcell said, "I will take you down and show you where it is." He said "come this way" and the two men and Mr. Purcell's man Fred Ross got in the car and went down. There was no gate or automatic or other device to keep the shaft closed until the car should arrive at the floor landing. Either Mr. Purcell or his man operated the elevator. There was no light in it. When they arrived at the basement floor the two other gentlemen got out and the plaintiff followed them. The basement was very dark, there was no light in it. They left the elevator at the basement floor and level with it. The man opened the doors to admit light. Mr. Purcell showed plaintiff the Armour leather and its markings, and left plaintiff with Fred and a helper whom he told to assist in moving it as plaintiff checked it out. He left in a few minutes. Plaintiff went to the open door of the basement, where he could see the marks on the leather as it was brought to him. There were ten sides in each roll,

and the weight of the roll was marked on the outside. Mr. Purcell, after giving directions where the rolls might be put when brought out of the basement, went out through the basement door, up the sidewalk and around the corner of the building, a total distance of about fifty feet, to the main entrance of the office floor.

The plaintiff, having substantially described these surroundings, proceeded to describe the immediate incidents of the accident, as follows:

"Mr. Anderson: A little louder; I can't hear you.

"The Witness: I said when he had taken all the rolls of leather out of the basement and I had come back in the basement and asked him if we were through, if he had taken all the leather, he says, 'Yes;' I says, 'Let's go upstairs,' and I started over toward the elevator.

"Mr. Anderson: Q. Who were you talking to? A. Fred, his man. I says, 'Let's go; if you are through we will go upstairs.' So I started to go up the same way we came down and I started over towards what I thought was an elevator, and it looked to me just like the open door of the elevator, and I stepped in, and as I stepped in I fell down to the bottom of the shaft. There were no lights there.

"Mr. Green: Q. Was there any guard or gate or anything there over that elevator shaft at that time? A. No, sir, not a thing.

"Q. Did you know the elevator was not there? A. No, sir; I did not.

"Q. Did you think it was there? A. I know it was not.

"Q. Did it appear as though it was there? A. It appeared as if it was there.

"Q. State to the jury how light it was down there at that time? A. Well, there was no lights down there; it wasn't light at all. The elevator being over away from the street, from any of the windows, if there were any windows there, it being dark you could hardly distinguish the shaft.

"Q. And how far into the shaft did you fall? A. Well, I have no means of ascertaining correctly, but I imagine between ten and twelve feet."

On cross-examination the plaintiff testified: "Q. So you could have walked that fifty feet and gone right into that doorway on the first floor of the building, couldn't you?" Here followed an objection and much argument.

The objection being overruled, the examination proceeded:

"Q. There was this perfectly good granitoid sidewalk; there wasn't anything the matter with the sidewalk, was there? A. Not that I know of.

"Q. You didn't see anything the matter with it at all? A. No.

"Q. Perfectly good solid granitoid sidewalk up to that doorway, wasn't there? A. As far as I know it was.

"Q. And you had been in that very doorway, the entrance to the building, the entrance to Mr. Purcell's office only an hour and a half or two hours before; that is true, isn't it? A. Yes, I had.

"Q. And you preferred and did go back into the basement, which you say was dark and unlighted; is that right? You still want to say that? A. I want to add this: That way back in the basement there was a gas jet, which the men lit in order to find the leather in the back part of the basement.

"Q. Way back in the back part of the basement. That was how far from where this elevator was? A. About twenty feet, I should say, as much as I can remember.

"Q. You wouldn't say it was one hundred and twenty? A. No; I can't say that.

"Q. Now, you say they lit a gas jet way back there; then they had some light back in the back part where it was dark, didn't they? A. In order to illuminate the basement; yes, sir.

"Q. They did have a light down there, then? A. At that time they did.

"Q. Gas light? A. But when they took the leather out and came back, that light was put out prior to my re-entry into the basement.

"Q. Then it had lapsed into total darkness; is that it? A. Well, you may call it such if you wish.

"Q. I don't wish to call it anything. All I want to find out is what you swear under oath was the condition there. A. I swore it was dark, and I still maintain it was dark.

"Q. That is the reason you say they had a light back there at one time. They turned the light out because there was no necessity for it; is that it? A. No; because they were through picking out the leather.

"Q. And they just turned the light out then because they didn't need any more light down there? A. Yes, sir.

"Q. Now, then, you left a good—perfect good sidewalk, out in the sunlight on the 23rd day of April, fifty feet from the doorway going into this gentleman's office, and this, with your full knowledge—you knew that, you say—to go back down into this basement, in the doorway leading into the basement and groped your way to where the elevator was. How far was the elevator from the door? A. Why, I would say, about twenty feet, I think.

"Q. About twenty feet. You had just come down out of there; you knew it didn't you? A. Well, I didn't measure the distance.

"Q. Did you grope around there to find the place where this elevator was in this total darkness? A. No, sir.

"Q. Or did you just walk right up to it; know where it was, and walk in there? A. You could see the shaft there. There was the dim outline of a shaft.

"Q. Then you knew that that elevator—where the elevator was; you could see this dim outline of the shaft? A. You could see the dim outline; yes, sir.

"Q. And you think it was about twenty feet from the door? A. I think so.

"Q.  Did you have to feel your way to this dim out-line, or did you just walk into it like you were walking right in to sit down to a hot bowl of oyster soup?  A. No, I walked cautiously.

"Q.  Because it was so dark?  A.  Yes, sir.

"Q.  And you could see the shaft; you saw the dim outline of it, and you knew it was an elevator shaft?  A. Yes, sir.

"Q.  And you were looking, were you, and using your eyes as you walked up to this shaft?  A.  I cer-tainly was.  .  .  .

"Q.  Now, when you went to where the elevator was, didn't you say to Fred, 'Come on, let's go?'  A. Words to that effect; yes, sir.

"Q.  Well, what did you mean, go where?  A.  Go up in the office.

"Q.  So you said to him, 'Come on, let's go up there?'  A.  Yes, sir.

"Q.  He was there how far from you at that time? A.  Well, he was right near me; two or three feet, I should say.

"Q.  Within two or three feet?  A.  Yes, sir.

"Q.  Well, he operated the elevator coming down, didn't he?  A.  Either he or Mr. Purcell."

I.  The plaintiff's appeal was taken, not from a final judgment of the trial court upon involuntary nonsuit suf-fered by plaintiff because of the instruction of the court directing the jury to return a verdict for defendant Gregg.  The order was limited in its terms to "an ap-peal to the Supreme Court of the State of Mis-souri from the order overruling his motion for a new trial and to set aside the involuntary nonsuit as to defendant C. D. Gregg."  The right of appeal is purely statutory, and does not apply to such an order.  [R. S. 1909, sec. 2038.]  No final judgment having been entered in the cause it is still pending in the court below, awai ing the determination of Purcell's appeal from the judg-ment setting aside the involuntary nonsuit in his favor

*Appeal.*

taken by plaintiff: It is only necessary, therefore, at this time, to further consider the presence of Gregg in this court for the purpose of dismissing the plaintiff's appeal, which we accordingly do.

II. It is admitted for all the purposes of this appeal that no light was provided in this elevator, and that the hatchway through which it passed this basement floor was not guarded or surrounded by any fence or gate

Contributory Negligence. whatever at the usual point of entrance and exit when this accident occurred, nor was there any automatic or other device which closed the entrance and exit to and from the shaft when the car was not at this floor landing. A valid ordinance of the city required all these measures of precaution and their absence contributed to the injury, of plaintiff, which would not, in all probability, have happened had they been present. In short, the petition properly pleaded and the evidence tended to prove that the appealing defendant was guilty of negligence directly contributing to plaintiff's injury.

On the other hand the appellant Purcell contends that the plaintiff's own testimony shows that he was himself guilty of negligence directly contributing to his own injury, and that he cannot therefore recover from another damages which he helped to inflict upon himself. His contributory negligence as a matter of law is the real question before us.

Contributory negligence, like all other negligence, is usually a question for the jury, but there is a degree of care which the *law* exacts as a condition to the recovery of pecuniary damages. Recklessness of one's own safety may seem to be his own affair until he attempts to shift the burden of its consequences from his own shoulders to the shoulders of another. It then becomes the affair of both and, the facts being admitted, the law must adjust it between them.

In this case the plaintiff was upon the premises of the appellant by virtue of the invitation implied from

commercial intercourse. By this invitation the owner assumed to use ordinary care for the safety of his commercial visitor. This degree of care is measured by the standard of the statutes as well as of the common law. If some of these precautions should be neglected it is still incumbent upon the visitor to give ordinary care and attention to his own safety as affected by the conditions which lie openly before him. This care is also measured by the law. These rules find a firm foundation in what we have been taught to call the golden rule.

Plaintiff was, according to his own statement, a business man of long experience, and we must assume that he was familiar with the ordinary appliances from the top to the bottom of structures in which the heavy goods produced and sold by his employers were marketed. In this case his story impresses us with a familiarity amounting to heedlessness.

He had transacted the business which was to result in the removal of the leather from the building, in the office on the first floor, which he reached by going into the main entrance at the corner of Main and Market streets. When he had finished, Mr. Purcell proposed to go to the basement and show him the leather. They stepped into the freight elevator, taking with them Mr. Fred Ross, the man who, with a helper, was to handle the leather. When they reached the landing in the basement, Ross and Purcell got out and he followed them. It was dark, and they opened the door to give more light, but it still remained dark at the elevator. Mr. Purcell showed them the leather. Plaintiff went outside the door on to the sidewalk where it was light to check the weight of the packages as they came out to be piled on the walk against the side of the building preparatory to hauling them to the Armour Warehouse. There were forty-two of the rolls, each one as big around as a barrel. They finished handling them in an hour or an hour an a half, and instead of walking fifty feet west on the granitoid sidewalk to the main entrance where he had first entered the office, he went back into the dark building where he

saw Ross and said to him, ''Let's go up,'' and without waiting for Ross or for an answer, walked to the dark shaft where there was no elevator, and into it, and fell to the bottom. In his testimony he emphasized the darkness at the elevator. He saw the same opening, two feet wide, out of which he had come with Purcell when they descended, and without any invitation or appearance to indicate that the cage had remained there during the hour and a half he had been absent, walked into the hole and fell ten or twelve feet to the bottom.

The trouble which was the immediate cause of this accident seems to have been that one of the double swinging doors that closed the entrance to the elevator on this floor was broken. This was evident, and the plaintiff so stated. His carelessness in entering the dark shaft without any attempt to ascertain or reason to believe that the elevator was there, was evidently the cause of the accident. The absence of the light in the elevator had nothing to do with it, for the ''elevator,'' in the sense in which the word is used in that provision of the ordinance, was not there.

We can fully appreciate the inexcusable carelessness of one who leaves unguarded an open hatchway like this, in the floor of a dark basement in constant use for the storage and handling of heavy goods by both employers and customers. In this case, to be sure, the space through which the victim must pass, or be thrust, to his fall, was only two feet wide. We need not charge our imagination with the task of suggesting possible injury from such a condition. The freaks of accident confound all foresight, and we guard against them by those conventional methods generally recognized as preventives, the most universal of which is to '' look where we step.''

On the other hand, what shall we say of the character of the carelessness of a man of intelligence and wide experience who walks up to such an aperture as we have just described, and, without any reason to believe that there is an elevator platform inside except that in the course of the constant business activities of such a place he had been

brought there on one an hour and a half before, steps off
into the darkness which fills the bottom of the shaft which
he knows is there.   There is something in the circumstance
which reminds us of the story of the absent-minded pro-
fessor who stood, with hat in hand, bowing his apologies to
the cow with whom he had collided on the sidewalk.   Plain-
tiff knew that the right side of the door was off, and, if his
mind acted at all, he staked his safety on the chance that
the cage was in the same position as when he left it an
hour and a half before. Had it been ever so dark a move-
ment of his foot would have determined it.

The principle which bars a recovery for an injury
arising from the negligence of both plantiff and defendant
was stated by the St. Louis Court of Appeals in Wheeler
v. Wall, 157 Mo. App. 38, as follows:

"In an action for personal injuries, where it appears
the injuries received might have been averted and the con-
sequences of defendant's negligence avoided by the exer-
cise of ordinary care on the part of the injured person, he
is not entitled to recover, the case being one of mutual
and concurring negligence, with respect to which the law
will neither cast all of the consequences on the defendant
nor attempt to apportion them between the parties; and
when it appears that though defendant was negligent,
the injury would not have occurred but for the negli-
gence of plaintiff as well, contributing proximately there-
to, will not be allowed."

In Marshall v. United Rys. Company, 184 S. W. l. c. 165,
REYNOLDS, P. J., of the St. Louis Court of Appeals in a
dissenting opinion, said of one who was injured by jump-
ing into an elevator shaft thinking the elevator was there:
"Boy that he was, then about fifteen years old, he must
have known that it was not safe to jump into a dark place
without knowing the depth or where he was to land.   Never-
theless he appears to have done that very thing, that is,
rushed into an unknown, dark opening, without the slight-
est attempt to ascertain the conditions.   In my judgment
his carelessness, which produced his injury, was the proxi-
mate cause of that injury and should so have been declared

287  Mo.—29

as a matter of law." The same cause was transferred to
this court where, in an opinion by BOND, J., we stated the
question as follows: "The theory of the appeal is that
plaintiff was guilty of contributory negligence in jumping
into the shaft without ascertaining the exact position of
the elevator, and that the unguarded shaft was not the
proximate cause of his injuries." [209 S. W. l. c. 932.]
We concluded as follows:

"After a careful examination of the record in this case,
it seems to us that, upon the testimony of the plaintiff him-
self, the conclusion is inescapable that his own contribu-
tory negligence was the proximate cause of the injuries sus-
tained by him when, without invitation or suggestion from
any one, he yielded to the impulse to jump into the open
shaft of the elevator. This is the view reached by REY-
NOLDS, P. J., in a separate opinion (184 S. W. l. c. 164,
165), which we think announces the correct principles of
law applicable on the undisputed facts in this case."

The case of Grote v. Hussmann, 223 S. W. 129, decid-
ed by the St. Louis Court of Appeals, draws plainly the
line of distinction between those cases in which the in-
jured party assumes for himself the risk of determining
the position of the elevator and those in which the safety
of the conditions in that respect is represented to him by
the defendant. The case turned upon that single point.
The court, referring to the plaintiff, said: "When he
started to the elevator shaft, he saw defendant's em-
ployee standing in front of this elevator shaft, with the
door open and his hand upon the door, a silent invitation
to enter. This portion of the building was dark; the lights
there were not burning. Defendant's witness, Heyer, so
testified; and this same witness admits in his testimony
that the door was open, and that he was standng in exact-
ly the same position he would stand when he was ready
to take passengers up on this elevator. This witness says
that he had his back turned to defendant at the time he
entered the shaft. If the jury believed this theory, they
could still have found defendant guilty of negligence, for
it cannot be said that defendant or his employee could

open the door to an elevator shaft in which there is an elevator used for the purpose of carrying passengers, and stand there in an attitude indicating that passengers may enter if they so desire, and turn his back to this opening and permit plaintiff, under such conditions, and in a poorly lighted portion of the building, to walk into the shaft and be injured, and then claim that plaintiff was guilty of contributory negligence as a matter of law.''

In this case the plaintiff took the initiative; in going from the door to the elevator he saw Fred Ross and remarked as he went on, ''Come on, let's go'', and, without giving anybody an opportunity to stop him, or any indication that he intended to go into the shaft whether the elevator was there or not, he entered without stopping or looking, and of course fell to the bottom. The difference in the two cases is that in the Grote case the defendant assumed or negligently appeared to assume to be in control of the elevator, and to invite the plaintiff to enter by acts usually implying such invitation. In this case the plaintiff, according to his own statement, took charge of the situation and gave no one any opportunity to interfere. In going down, which was his only previous trip in that elevator, it was operated, he says, by Purcell or Ross. He does not recall which. They invited him in, and when they reached the basement landing they stopped the elevator at the right place and invited him out. In his attempt to go up he himself was captain of the enterprise until he stepped off into the dark, and the enterprise, so far as its legal aspects are concerned, was fully accomplished.

We think his own act was the direct and proximate cause of his injury. The acts with which defendant is charged went no further than to give him the opportunity.

What we have said applies equally to both these appeals. In case of the appeal of defendant Purcell from the order of the court setting aside the nonsuit against him, said order is reversed. The appeal of plaintiff from the order refusing to set aside the nonsuit as to Gregg is dismissed.

The cause is remanded to the Circuit Court of the City of St. Louis for such further proceedings upon the judg-

ment of nonsuit as entered in that court, as may be in accordance to law and the practice of the court. *Ragland* and *Small*, CC., concur.

PER CURIAM:—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All of the judges concur.