Ronald Ray Jackson, Plaintiff-Appellee, v. John F. Beasley Construction Company, Swift & Company, and Mississippi Valley Structural Steel Company, a Corporation, Defendants, Appeal of Swift & Company, Defendant-Appellant.

Gen. Nos. 50,227, 50,244.

First District, First Division.

October 17, 1966.

Tom L. Yates and Winston, Strawn, Smith & Patterson, of Chicago (Edward J. Wendrow, of counsel), for appellant.

James A. Dooley, of Chicago, for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

This is a personal injury action brought by plaintiff against the three defendants under the common law of Missouri for injuries received when he fell from a "catwalk" in a building under construction. At the close of the plaintiff's case, the court directed a verdict for defendant Mississippi Valley. The jury returned a verdict in favor of defendant Beasley and a $90,000 verdict in favor of plaintiff against defendant Swift. The jury also specially found that plaintiff was not guilty of contributory negligence. Swift appeals from the judgment against it.

On appeal, Swift's principal contentions are (1) the judgment against Swift should be reversed because there was no evidence that it was guilty of any negligence toward the plaintiff; (2) plaintiff was guilty of contributory negligence as a matter of law; and (3) the court committed reversible error in the giving of instructions on behalf of plaintiff and Beasley and in refusing instructions and a special interrogatory tendered by Swift.

Swift, prior to October 15, 1956, the date plaintiff was injured, had entered into a number of prime contracts for the construction of a fertilizer plant in St. Joseph, Missouri. One of the prime contracts was with the A. C. Samford Company, which was to be responsible for "the construction and completion of a plant food manufacturing building, office building, pump house and roadways." Another prime contract was with M. L. Anderson, doing business as Kayo Anderson, not a defendant here. The provisions of this contract are not in the record, but the evidence indicates that Anderson had a machinery installation contract. A third prime contract was entered into with the Mississippi Valley Structural Steel Company, which was to do "all the structural and miscellaneous steel work, walkways and grating erected in place for a 144 foot by 410 foot single story plant food manufacturing building." Mississippi Valley, in turn, subcontracted with defendant John F. Beasley Construction

to erect the structural steel work as it was fabricated and furnished by Mississippi Valley.

Both the contracts with Samford and with Mississippi Valley called for the work to be "constructed to the satisfaction of, and under the supervision and in accordance with the specifications and drawings prepared by E. A. Schiewe, the architect." Also, both contracts were signed on behalf of Swift by "E. A. Schiewe, Architect," who was manager or head of Swift's Construction Department. In each contract, the "Architect's status" provided that "he is not the agent of the owner, except in structural emergencies, and except when in special instances he is authorized by the owner to so act." The provisions also included "Architect's authority in emergencies":

"The architect has authority to stop the progress of the work whenever, in his opinion, such stoppage may be necessary to insure the proper execution of the contract. In an emergency affecting the safety of life or of the structure or of adjoining property, he has authority to make such changes or to order such work, extra to the contract, or otherwise, as may in his opinion be necessary."

During the erection of the plant, Harold R. Brown, a full-time employee of Swift Construction Department, was on the job as the "architect's representative" for approximately one year. It was his duty to see that the contractors complied with the terms of the contract. He checked the quality of the materials that were delivered to see that no substitutions were made. He was not a graduate engineer.

The plaintiff's testimony shows that he was a carpenter employed by Samford [not a defendant] and started to work on the building "around October 1, 1956." There were various other trades working there, and three cat-walks, made of expanded metal, were used by the men "in

285

going to and coming from their work whenever they were available to the men."

On October 15, 1956, he was working on the roof, and about 3:00 p. m. he had occasion to leave the roof to go to the rest room, which was on the ground level. He said, "I had occasion to get on a catwalk there. I had never been on this particular catwalk before. I was going to move east, on this catwalk, to a ladder that was in front of me. That ladder led down; it was made of metal. . . . I was walking along. Something unusual very definitely did happen to me. I fell through a hole in the catwalk, about 36 feet. Below me on the ground were some conveyor forms. The surface of the floor was concrete."

It was the first time plaintiff had used that particular catwalk, and he was "walking, with my eyes ahead facing the ladder, which was ten, fifteen feet or so from me—maybe a little further. I did not turn my head to talk to Russell about that time. When I turned my head to talk to Russell I was further back—five steps or so. That would put me ten—fifteen feet from the ladder, roughly. At the time I turned and talked to Russell I had stopped. . . . After I had this conversation with Mr. Russell, I started up again. Then I was looking in the general direction of the ladder. I never saw that missing area. The shadows obstructed my vision. The sun's rays was right back over my head. . . . My eyes were on the general area where I was walking. I was not walking with my head up in the air, and I wasn't afraid of becoming dizzy. I had been instructed never to look at your feet. Looking at a distance of about six or seven or eight feet ahead of me as I was walking along, I could look at the floor of the catwalk. It appears to be solid from an angle."

Russell Osborn, a fellow employee, testified on behalf of plaintiff. He was working about six feet above plaintiff and a little to the rear. Plaintiff was walking on the catwalk with his back toward him, and plaintiff looked back at him and said, "Let's go and get a cool drink of

water." "Right immediately after he talked he fell. When he talked to me he glanced back at me. By glancing, he turned his head (indicating). Just shortly after he talked to me he said, 'Oh' and disappeared from view." He further testified that neither he nor plaintiff had ever used this particular catwalk before the occurrence. After plaintiff fell, Osborn saw there was a piece of the catwalk missing—"about a three foot section."

Beasley workmen had left the jobsite on September 12, 1956, without having completed the catwalk from which plaintiff fell, because all the material required had not been shipped by Mississippi Valley. The catwalk, a permanent part of the structure, was about three feet wide with a railing on one side and was made of rust colored steel wire mesh.

Beasley's foreman, John T. Feltman, testified that all Beasley personnel left on September 12, 1956, and on that date he had occasion to check the job with Brown. "That is called sealing the job. It is a final inspection of the job to make sure that everything has been done according to their satisfaction. Mr. Brown and Mr. Blizzard [Beasley's job superintendent] accompanied me on that tour. We used a punch list . . . and as you go through the project, if a little minor things are needed to be changed, they will mark it down on this paper and in turn, those are the corrections that is needed to be made. That was done on this occasion. That is customary in the contractor business."

Feltman further testified that they discussed "this piece of expanded metal that was missing in this catwalk. Mr. Brown told us that if we would go ahead and put a plank over this open hole, that he would have this Steel Construction Company or some other construction company on the project put the metal in when it arrived on the jobsite. The metal piece was not available at that time because it was failed to be shipped by Mississippi Valley . . . and locally could not be purchased. . . . In

accordance with Mr. Brown's suggestion, I put a two by twelve plank over the hole . . . and wired it down. They were my employees. I saw the job done. It was done when I left the job on September 12. After that I did not do any more work on the catwalk on that construction job." On cross-examination, he testified, "I suggested that they put a plank over it for safety precautions. I don't believe I recall whether it was Mr. Brown or I who said that it ought to be covered as a safety precaution. There were men other than ironworkers working on the building."

Swift's employee Brown testified that in the conversation on September 12, 1956, described by Feltman, he talked only with Paul Blizzard, the job superintendent, and "Mr. Feltman was standing there. I had no conversation with him at any time. . . . I pointed to this void in the grating of the catwalk and asked Mr. Blizzard if he knew that it was missing. He said that he did, that they didn't have any piece to put down at that point. I said, if I were you I would get it covered up. And he turned to Mr. Feltman and instructed him to cover it up. Feltman went right over as if to do it. I don't know whether he did it or not. I did not tell Mr. Blizzard that I would undertake to have someone else cover the void in the catwalk. Swift & Company had no employees other than I on the premises. I have no knowledge as to who actually completed the catwalk, or as to who finally installed the metal. I didn't personally see it done."

On October 15, 1956, he was informed that a man had fallen, and he called for an ambulance and went to the site of the occurrence and found plaintiff near the floor of the building. He looked at the catwalk and "saw a void in it. Later in the day I assume it was covered with some other material." He "never saw that opening uncovered after I had this conversation with Mr. Blizzard before he left the premises the first time."

288

Feltman also testified that about the first week of October, 1956, he returned and asked if the piece of catwalk had come in yet and was advised that it had not. He said that Brown told him that he would have another contractor install it when it arrived. Brown denied this.

James Micrander, an ironworker employed by Kayo Anderson, the machinery installer, went to work about October 4, 1956. From then until the occurrence, he and his coworkers used the instant catwalk several times a day. He was on it the day before, and the gap in the catwalk was covered then. On one occasion, he saw the planks removed and carpenters taking lumber up through the opening. The carpenters were employed by Samford.

Bob White, also employed by Anderson, saw planking over the gap, but it was not there continuously—"I saw that hole open occasions before this." He saw a lot of material being passed up when the hole was uncovered.

Marion Anderson, president of Kayo Anderson, said that in the course of his company's work, the catwalk in question, with the plank on it, was used as often as ten times a day.

Initially, Swift contends that it was not guilty of any negligence toward plaintiff because "it had no possession or control over the premises at the time of the accident, the same being in independent contractors which were constructing the plant," and that "Swift's only connection with plaintiff's accident was the fact that it had a representative on the job to see that the contracts were complied with," and "the erection was performed by independent contractors to which possession and control of the premises had been turned over and it had not yet been resumed by Swift at the time of the accident. Nevertheless, the trial court held, at the conclusion of all the evidence, that Swift was in control as a matter of law."

Swift argues that Samford and Mississippi Valley were plainly independent contractors under the law of Missouri

(Williamson v. Southwestern Bell Tel. Co. (Mo), 265 SW 2d 354, 358), for whose negligent acts Swift is not liable, and "the employer of an independent contractor does not become liable as a principal because he engages an architect to supervise the work and see that it is done according to the construction contract. . . . Ordinarily the owner of premises is not required to inspect the work of an independent contractor to determine whether the work is being done in a way that will provide a safe place for the contractor's employees to work." Martin v. First Nat. of Independence Co. (Mo), 372 SW2d 919.

As to Brown's presence on the job, Swift argues, "No case in Missouri, or anywhere else for that matter, holds that a limited power of intervention in the case of emergencies and the mere presence of an employee to see that contracts are properly performed precludes an independent contractor relationship." Citations include Boulch v. John B. Gutmann Const. Co., Inc. (Mo App), 366 SW2d 21, 29, where the court said:

> "The admission by Harder [employee of sub-contractor] that the foreman of the Gutmann Company [general contractor] was present at all times to check whether the work done by him complied with the specifications on the job was no more than that of the ordinary general contractor in seeing that the subcontractor performed his work in the best workmanlike manner according to the plans and specifications."

Swift further contends that "the uncontradicted fact is that at the time of plaintiff's accident Swift had not resumed possession and control of the premises. At that time it was in no more possession and control than it was when the contracts were let and Samford and the other contractors put into possession. The building was only partially completed and Swift's status regarding posses-

sion and control was unchanged. . . ." Cited is 38 Am Jur 753:

"However, the liability of an owner or occupant of real estate in reference to injuries caused by a dangerous or defective condition of the premises depends in general upon his having control of the property. In fact, such liability depends upon control, rather than ownership, of the premises."

Other citations are offered to show that "the Missouri cases make it clear that control of the premises at the time of the accident is an indispensable requisite to liability to third persons for the condition thereof."

In sum, Swift argues that "the owner is not liable to an employee of a contractor for injuries suffered on account of a dangerous condition created by a subcontractor until such time as he has resumed possession and control of the premises," and that plaintiff has failed to make proof that "Swift negligently 'controlled its premises' so as to cause injuries to the plaintiff."

■ As to Swift's contention of "no possession or control over the premises," plaintiff concedes that "as a general rule, the owner of premises is not liable for injuries caused by the negligence of an independent contractor over whom the owner exercises no control, and also that the State of Missouri, whose laws govern as the situs of the occurrence, follows the general rule in an appropriate case."

Plaintiff contends that the "defense of independent contractor" rule does not apply here and argues, "the undisputed facts in evidence, however, are inconsistent with the theory that Brown was looking only to the results of the work, and also show that Swift not only retained the right to supervise and control the work, but that it exercised such right through its employee, Brown. Under the circumstances, the Missouri decisions

291

make it clear that Swift cannot avoid liability to plaintiff."

Plaintiff's authorities on this point include Klaber v. Fidelity Bldg. Co. (Mo App) 19 SW2d 758, where it is said (p 762):

> "Of course it is well settled that one employing an independent contractor may become liable for injury to a servant by interfering and assuming control."

Also Lawhon v. St. Joseph Veterinary Laboratories (Mo), 252 SW 44, where the Missouri Supreme Court reversed a verdict and judgment for a defendant owner and said (p 48):

> "This evidence was sufficient to warrant the inference, not only that there was a contract of employment, but that the defendant had therein reserved the right to supervise and direct the manner of executing the work in detail."

In Stiebert v. May Dept. Stores Co. (Mo), 218 SW2d 113, the architect was a defendant owner-employer, and the court said (p 116):

> "The crews of both employers were working together in a comparatively limited space under the general supervision of the store architect, and there can be no doubt that he had general control of the work."

In Stanley v. Louisiana Pure Ice & Supply Co. (Mo App), 279 SW 157, it is said (p 160):

> "In arriving at this conclusion, we have in mind the accepted rule that supervision of work may be retained without interfering with the independent action or liability of contractors who have engaged to perform it or subdivision of it."

292

In Larson v. Metropolitan St. Ry. Co. (Mo), 19 SW 416, the defendant's chief engineer occasionally visited the work and his assistant was constantly at the site. There the court said (pp 417, 418):

"The work was done precisely as ordered. Thus it was the exercise of the discretion or judgment vested in the supervising authority which caused the catastrophe; and for that exercise of judgment defendant must respond."

■ After examining this record in the light of Swift's assertion that Samford was the "general contractor," and that Swift "had no possession or control over the premises" at the time of the occurrence, we conclude the evidence does not support this contention. Swift made a number of prime or direct contracts with different contractors for various phases of the construction of its "plant food manufacturing plant," such as the pile driving, the "construction and completion" of the building, the "structural and miscellaneous steel work, walkways and grating," and the machinery installation.

The contracts with Samford and Mississippi Valley both provided that the work to be executed was to be "to the satisfaction of, and under the supervision and in accordance with the specifications and drawings prepared by E. A. Schiewe, the architect," a full-time employee of Swift. Brown, another full-time employee of Swift, was on the project daily for approximately a year, and it was his duty to see that the separate contractors complied with the terms of the contracts.

Brown had conversations with Beasley's foreman regarding "features" of the work. It is undisputed that only Brown and Beasley's men discussed the gap in the catwalk, and that Brown either suggested or approved the use of a plank to bridge the gap through which plaintiff fell. The evidence also shows that the plank was fre-

quently walked on by workmen and removed from time to time to permit material to be hoisted to the roof through the gap. It is a reasonable inference that Brown, being on the jobsite daily, was aware of the practice of removing the plank for material hoisting. It was "the exercise of the discretion or judgment" of Brown that resulted in the "catwalk gap" being bridged by a plank, and thus becoming a proximate cause of plaintiff's injuries. (Larson v. Metropolitan St. Ry. Co. (Mo), 19 SW 416.) This conclusion is also supported by the foregoing Missouri authorities. It follows, therefore, that the trial court was correct in ruling that Swift could not rely on its independent contractor defense and, also, "as a matter of law that the owner had control."

■ Defendant Swift further contends that "even if Swift owed plaintiff the duty of care owed a business invitee, there is no evidence that Swift, through Brown, knew or should have known, that the catwalk was in a dangerous condition." We find no merit to this contention because, as mentioned above, Brown was on the job daily, participated in the temporary measures made to bridge the gap, and also was checking the quality of the materials delivered. Brown must have been aware of the intended use of materials, and that roofing materials were being hoisted into place through the "catwalk gap." This required removal of the plank, which was being walked on daily by various workmen. Brown testified he never saw the plank missing, but all the workmen who testified said it was a frequent occurrence, and Brown did admit that he saw the gap uncovered after plaintiff fell.

Swift further contends that "even if Swift owed plaintiff the duty of care owed a business invitee, it owed him no duty to warn him of the obvious gap in the catwalk." Swift's authorities cited in support of this point include Stafford v. Fred Wolferman, Inc. (Mo), 307 SW2d 468, where the court said (p 475):

"But the inviter is not liable for failing to warn of a danger known to it and unknown to the invitee if the danger is so apparent that it would or should have been known to the invitee."

and Harbourn v. Katz Drug Co. (Mo), 318 SW2d 226, 229:

"In the application of this rule it has been held that 'The duty to keep premises safe for invitees applies only to defects or conditions which are in the nature of hidden dangers, traps, snares, pitfalls, and the like, in that they are not known to the invitee, and would not be observed by him in the exercise of ordinary care. The invitee assumes all normal, obvious, or ordinary risks attendant on the use of the premises, and the owner or occupant is under no duty to reconstruct or alter the premises so as to obviate known and obvious dangers.' . . . It follows that when the condition contended to constitute an unreasonable risk is obvious to one in the exercise of ordinary care, or is actually known to the invitee, there is no duty on the owner or occupier to warn him. . . . Therefore an owner or occupier is not liable for injuries resulting from open and obvious conditions which are or should be as well known to the invitee as to the owner or occupier."

On this point, plaintiff contends that "it is axiomatic that one having work done on his premises by one who is an independent contractor, and who retains control of the premises during the progress of the work, is under an obligation to keep [the premises] in a reasonably safe condition for the servants of the contractor. See: 57 CJS, Master and Servant, sec 603, p 374." Plaintiff also cites Schneider v. Southwestern Bell Tel. Co. (Mo App), 354 SW2d 315, 318:

"The law is well settled that defendant, as owner and occupant of its building, has the duty to exercise

ordinary care and diligence to have its building in a reasonably safe condition for the use of an employee of an independent contractor who occupies the position of a business invitee. Where such employee is engaged in working on defendant's premises, the owner has a nondelegable duty to warn him of any condition unknown to him that was not safe or could not be made safe. . . . [p 320] It is immaterial to the issues whether the wire was actually placed there by an employee of an independent contractor, as shown by the evidence, or by an employee of defendant. A finding that defendant permitted it is equivalent to a finding that defendant knew it. . . .

"The defendant's duty to furnish a safe place for plaintiff to work, being nondelegable, applies equally whether the dangerous consideration be caused by a fellow servant or an independent contractor, since the law will not permit defendant to shift this responsibility to anyone else."

As to this contention, we believe the evidence fairly shows that Beasley's work was completed and accepted by Swift, through Brown, on September 12, 1956. Brown and Beasley's employees made a final inspection called "sealing the job," and Brown suggested or consented to the method of bridging the "catwalk gap" in a manner that was equivalent to a waiver of full performance or the acceptance of a defective performance, i. e., the placing of the plank across the gap and inferentially accepting the responsibility for its continuance in place. It is stated in 17A CJS, Contracts, § 514(2):

"An acceptance of the work or structure, as in compliance with the contract, will ordinarily constitute a waiver of a full performance or defective performance of a building and construction contract, where the defects or imperfections are of such a nature that owner is, or should be, aware of them,

and such acceptance may be expressed or implied from the conduct of the owner."

In Casey v. Hoover (Mo App), 89 SW 330, it is said (p 334):

"When he [proprietor] accepts work that is in a dangerous condition, the immediate duty devolves upon him to make it safe, and if he fails to perform this duty, and a third person is injured, it is his negligence that is the proximate cause of the injury. His liability may be incurred either from his substitution for the contractor or from his neglect to repair."

■ The evidence supports plaintiff's assertion that "Swift accepted Beasley's work and excused it from any further performance, even though Swift knew a section of the flooring had not been installed in the catwalk. Under the circumstances and the general rule, liability for the unsafe condition shifted to Swift, notwithstanding the work was that of an independent contractor."

The situation presented comes within the statement made in Bartling v. Firestone Tire & Rubber Co. (Mo App), 275 SW2d 618, where the court said (p 624):

"In our opinion the evidence was sufficient to support a finding that reasonably prudent persons, in the position of defendants, would have realized that the condition in question involved an unreasonable risk to business visitors, and would have anticipated that such visitors might not discover the condition or realize the risk involved therein, and in the exercise of reasonable care would have made the condition reasonably safe or given an adequate warning to enable them to avoid harm. The question whether defendants were negligent in maintaining the pass door, without giving adequate warning that it did not extend to the level of the floor, was one for

the jury to decide. The verdict of the jury was necessarily predicated upon a finding that defendants were negligent and that plaintiff was not contributorily negligent."

Next considered is defendant's contention that "plaintiff was guilty of contributory negligence as a matter of law." Swift argues that there was nothing in front of plaintiff to obstruct his vision while he was walking toward the "catwalk gap,"—"Plaintiff said there were shadows back over his head made by the purlins or steel beams. Shadows, however, do not make visible things invisible and plaintiff does not know whether there was a shadow over this 6 feet by 3 feet gap because he never saw it. The building was open to the sky and there was as much light as daylight could throw upon any open place."

Swift asserts "Plainly, plaintiff was not exercising ordinary care for his own safety as he was walking upon the catwalk. Either he was not looking where he was going, or, if he was, he was not looking with the degree of care required by law.

> " 'The duty to exercise ordinary care to avoid injury includes the duty to exercise ordinary care to observe and appreciate danger or threatened danger. A person is required to make reasonable use of his faculties of sight, hearing, and intelligence to discover dangers and conditions of danger to which he is or might become exposed, and one injured as a result of his failure to use his faculties to observe and discover a danger which would have been observed and discovered by an ordinarily prudent person is guilty of contributory negligence.' Chisenall v. Thompson, 363 Mo-538, 252 SW2d 335, 337.

"A failure on the part of plaintiff, who owes a duty to look, to see what is plainly visible when he looks, con-

298

stitutes contributory negligence as a matter of law. . . . 'Where one is charged with the duty to look and to look is to see, he must be held to have seen what looking would have revealed.' Smith v. Kansas City Public Service Co., 328 Mo 979, 43 SW2d 548, 553."

Swift further argues plaintiff had no right to assume the catwalk or any other part of the building was finished and in safe condition, and that an invitee on the premises undergoing construction takes the risk of using the premises in the condition in which he finds them. Also, "had the plaintiff been looking where he was going he could not have avoided seeing this huge gap in the walk." It was aptly said by the court in Bonanomi v. Purcell, 287 Mo 436, 230 SW 120, 124;

> "The freaks of accident confound all foresight, and we guard against them by those conventional methods generally recognized as preventives, the most universal of which is to 'look where we step.' "

As to the special finding of the jury that plaintiff was not guilty of contributory negligence, Swift asserts, "This finding was not based upon any evidence but merely upon sympathy for plaintiff's injuries," and the finding is no more binding than the general verdict. Illinois Steel Co. v. Mann, 197 Ill 186, 189, 64 NE 328 (1902).

Plaintiff argues that the issue of his contributory negligence was one of fact for the jury, and "Under Missouri law, like that of Illinois, the determination of whether a plaintiff is guilty of contributory negligence is one of fact, unless reasonable minds could not differ about the conclusion that plaintiff failed to act as an ordinarily careful and prudent person would have acted under the circumstances. Or, to state the proposition another way, where reasonable minds might differ and different conclusions might be drawn from the evidence, questions of negligence and contributory negligence are

for the jury." Fortner v. St. Louis Public Service Co. (Mo), 244 SW2d 10, and others.

Plaintiff asserts there was uncontradicted evidence that the sun was shining and that girders and sections of the roof, which were being installed, cast shadows on the catwalk, and that plaintiff's testimony that the grated flooring of the catwalk appeared solid from an angle was in no way contradicted. Plaintiff also asserts that Osborn was uncontradicted in his testimony that he had not seen the gap in the catwalk, even though he was standing 6 to 7 feet above the surface of the catwalk and within 10 to 15 feet from the gap. Plaintiff's authorities include Elgin v. Kroger Grocery & Baking Co. (Mo), 206 SW2d 501, 507:

> " 'As a general rule, a man is not required to look for danger when he has no cause to anticipate danger, or when . . . it be caused by the negligence of another.' . . . The issue of respondent's contributory negligence was for the jury."

We are not persuaded that this case calls for the application of the "plainly visible" doctrine relied on by Swift. Plaintiff had been working on the jobsite for about two weeks and had seen at least three catwalks "used by the men in going to and coming from their work whenever they were available to the men." He had occasion to use another catwalk but had "never been on this particular catwalk before." It is a fair inference that the use of the catwalks by other men that he had observed was without incident and sufficient for him to reasonably believe that the catwalk in question was fit for his use. We believe the statement made in Swenson v. City of Rockford, 9 Ill2d 122, 136 NE2d 777 (1956), at p 128, is applicable here:

> "Though she was not looking down at the precise moment of the incident, she was not necessarily re-

300

quired, as a matter of law, to be looking down at the exact moment, although that circumstance might properly be considered by the jury, with all the relevant circumstances in evidence, in reaching its determination as to due care."

We hold that the issue of plaintiff's contributory negligence was properly submitted to the jury.

Finally, we consider Swift's contention that the court committed reversible error in the giving and refusing of instructions. Swift asserts the court gave 16 instructions on behalf of the plaintiff, 6 on behalf of defendant Beasley, and 5 on behalf of defendant Swift, and not a single instruction given on behalf of Swift related to any issue in the case.

Swift argues that "figuratively and literally, Swift was 'instructed out of court.' This was not only due to the fact that the court refused every instruction of Swift relating to its theory of defense, but gave such instructions as one on behalf of plaintiff that Swift had a duty to use 'ordinary care to furnish plaintiff a safe place to work' without requiring a further finding that Swift was in control, and ignoring the fact this was a building under construction, and one on behalf of Beasley that if its work was accepted by Swift responsibility for any defects 'rests on the owner' without regard to whether Swift was in control or not. In the state of the instructions it is difficult to see how the jury could have failed to return a verdict against Swift and in favor of Beasley."

 We have examined the instructions given and refused. We have also examined that part of the transcript which includes the conference between the trial court and counsel to settle the instructions. The conference was lengthy. An extended discussion was engaged in about any questioned instruction. We find the jury was adequately instructed on the issues presented, and the evidence offered by both sides. The instructions

301

were within the guidelines accepted by this court in determining defendant's other contentions. As we find no reversible error in the giving of the instructions, a detailed discussion of the questioned instructions would unnecessarily lengthen this opinion.

For the reasons given, and as we find no reversible error in this record, the judgment in favor of plaintiff and against Swift is affirmed.

Affirmed.

KLUCZYNSKI, P. J. and BURMAN, J., concur.