EDWARD KEETER, Appellant, v. DEVOE & RAYNOLDS, INC., DIRECT STORES COMPANY, Corporations, and ROY E. HARRISON.—93 S. W. (2d) 677.

Division Two, April 23, 1936.

*Kennard & Gresham, F. M. Kennard* and *Walter J. Gresham* for appellant.

*William S. Hogsett, Leo B. Parker* and *Lowell L. Knipmeyer* for respondents.

COOLEY, C.—Action for damages for personal injuries sustained by plaintiff when struck by a descending freight elevator. Plaintiff obtained judgment for $23,500. The circuit court sustained defendants' motion for new trial and from that order plaintiff appealed. One of the grounds on which the court sustained the motion for new trial being that the plaintiff was guilty of contributory negligence it will be necessary to state the facts, especially those bearing upon that issue, with some detail. Plaintiff's evidence tended to show the following:

The corporation defendants, tenants under a lease from the owner of the building, operated a store on the first floor of a six story building in Kansas City. Their lease included part of the basement beneath their storeroom and also entitled them to use the elevator. Harrison was their employee and was manager of the store.

The store fronted west on Walnut Street, the front being on a level with that street. At its east end the store abutted on an alley, in which there was a "dock" or platform, some eight feet higher than the Walnut Street floor of the store, at which merchandise or other freight could be unloaded from trucks and thence taken by the elevator to the several floors of the building. The elevator shaft extended from the basement floor, at the southeast corner thereof, to at least the fifth floor of the building. A witness for plaintiff testified that it served five floors. Various other tenants of the owner of the building occupied space on the first floor and the floors above and had the same rights as defendants to use, and did use, the elevator. The elevator shaft was not in the part of the basement leased to defendants. It opened into what is referred to by witnesses as an areaway, extending northward from the shaft and separated from defendants' part of the basement by a wall, in which there was a door, or perhaps double doors, opening from defendant's part of the basement into the areaway. The basement door to the elevator shaft opened outward from the shaft into said areaway. It is described as a heavy door, about the width of the elevator shaft, swung on hinges at the side and having a weight attached to it by a rope so arranged by means of pulleys that the weight caused the door to close automatically and remain closed unless propped or otherwise fastened open. This apparatus was in good working order at the time of plaintiff's injury. Mr. Frank McLaughlin, city elevator inspector, a witness for plaintiff, testified that said door was not connected with the elevator, so as to be closed automatically by the elevator leaving the basement floor; that an "automatic gate" so connected with the elevator was not "the city ordinance requirement for a basement gate" and was not generally used; and that the elevator in question, as maintained and used, was of similar construction and equipment to the ordinary freight elevator in Kansas City. It appears that said areaway, as well as the elevator itself, was used in common by other tenants in the building. The elevator platform was not enclosed with a railing or otherwise than by the walls of the elevator shaft. When at the basement floor the platform was about on a level with said floor.

Defendants had sold to the King Lumber Company some show cases and steel lockers, which said company was to remove. Plaintiff was an employee of said company. The show cases were on the store floor and were taken out by the Walnut Street entrance. The lockers were stored in defendants' part of the basement. Four of King Lumber Company's men came for the lockers, viz., plaintiff, Eugene King, Scott King and one Keeling. They came in a truck, driven by Grover Hyde. Eugene King was in charge of the party. He got off the truck at the Walnut Street entrance, entered the store and

told Harrison he has come for the lockers. Harrison took him to the basement by a stairway, pointed out the lockers, opened the door or doors leading from the basement into the areaway and returned, by way of the stairway, to the store floor. The truck, with the other members of King's party, drove into the alley at the rear of the store and backed up to the dock above mentioned. About that time plaintiff says he heard and saw the elevator, the platform of which was, when he first saw it, slightly—perhaps a foot,—below the level of the dock. There was a man on it, who was operating it and who had evidently brought it to the dock. He was moving it up and down to "spot" it at the dock level. Plaintiff at the trial testified that he did not know (nor did those with him), whether the elevator had come from above or below. In a deposition previously given plaintiff had testified that the elevator had come from above. Neither plaintiff nor any of those with him knew that man nor who he was, and his identity is not shown. Neither does it appear how he happened to be bringing the elevator to the dock. It appears from plaintiff's evidence that he was not an employee of defendants. Harrison, called as a witness by plaintiff, testified that at the time there were only two employees of defendants about the premises, he and a Mr. Asel (who was not called as a witness), and that both were busy waiting on customers in the store. There was no other evidence on that point. Plaintiff testified that when said unknown man got the elevator spotted at the dock he said "All right, men," and plaintiff, Scott King and Keeling got on the elevator and were taken down to the basement floor, Hyde, the truck driver, remaining on the truck. Nothing further was said at any time by the man thus operating the elevator, nor by any of the men to him.

Arriving at the basement floor plaintiff, Scott King and Keeling stepped from the elevator platform into the areaway above mentioned, the man who had brought them down remaining on the elevator. That was the last that was seen—or heard—of him. Nothing was said as to whether or not the elevator was to remain at the basement floor. There was nothing at all said. As the three men emerged from the elevator shaft they met Eugene King. Harrison was not there, having gone back upstairs. Eugene took the men to where the lockers were in the basement, pointed them out, and directed the men to load them on the elevator, and then went upstairs to settle with Harrison. Plaintiff and Keeling each took hold of an end of one of the lockers and started with it to the elevator, plaintiff walking backward and Keeling forwards. Without looking to see whether or not the elevator was still there plaintiff backed into the elevator shaft. The elevator had been removed, by whom or at whose order, if any, is not shown. There is no evidence from

which it can legitimately be found that it was removed by an employee of defendants or by their direction. As plaintiff stepped into the shaft the elevator was descending and it caught plaintiff, crushed him down, and inflicted the injuries for which he sues. He thus describes the occurrence:

"We picked the iron locker up and I was walking backwards on the floor, looking right on the side, and Mr. Keeling was coming with the other end facing me and I was walking right along and turned in, thought I would walk in on the elevator and sit my end down and he would stand his up, we had to stand them up in the elevator, and so when I came around the corner I made a step and I stepped down something like a half foot or something like that and I looked and when I looked I thought I stepped into a hole and when I looked I seen the elevator had been removed and at that time something commenced kind of pushing down on the back of my head and I got my head kind of turned as I went on down and I seen it was the elevator."

Keeling, glancing up, saw the descending elevator about the time it struck plaintiff. He called out "Hold the elevator, there is a man under it." He had to call three times before the elevator stopped. Then, at a called request from him the elevator was raised a few feet and he pulled plaintiff out from under it. By whom it had been thus lowered and raised is not shown. One of plaintiff's witnesses said there was no one on it when it struck plaintiff. In taking the locker from where they got it in the basement to the elevator, plaintiff and Keeling moved first eastward from the basement into the areaway, then turned at about a right angle and went southward a few steps in the areaway to the elevator shaft.

Plaintiff testified that when he, Scott King and Keeling went down in the elevator from the dock the door of the elevator at the basement floor was standing open; that neither he, King nor Keeling opened it or propped it open. He did not see anybody do so. King and Keeling corroborated him in this. Harrison first said he had not opened that door. Confronted with certain questions and answers in his deposition, previously given, which indicated that he may have there said that he had opened that door but had not propped it open he said that he thought he was there referring to the door leading from the basement into the areaway (which he admitted having opened), but wound up by testifying that he was not certain whether he had opened the door to the shaft or not. He testified that he had not propped the door open and that, even if he had opened it, it would not have stayed open unless propped.

Eugene King, plaintiff's witness, testified that Harrison did not open the door to the shaft; that when he (King) went into the areaway after Harrison had shown him the lockers in the basement

and gone back upstairs, "just as I got there my men were pushing open the door, they came down on the elevator, and they were pushing open the door. . . . They was either pushing the door open or else it was already open. Anyway they were just coming out of the elevator." He said he did not open that door nor prop it open; did not see anyone prop it open and did not know whether or not it was propped; that it stayed open.

In regard to light in the basement and areaway, without going into detail it may be stated that it appears from plaintiff's evidence, without dispute, that the light was sufficient for plaintiff easily to have seen, had he looked, that the elevator was not at the basement floor when he backed into the shaft.

Plaintiff's petition charges several specifications of alleged negligence. Some relate to the construction and maintenance of the elevator and shaft, some to defendants' failure to keep the elevator at the basement floor until the lockers were loaded thereon. Those issues were not submitted to the jury. It is further charged that it was the custom of the various tenants of the building, "of their own volition and as need dictated," to pull the elevator from one floor to another, with no fixed method of operating it or of telling where it was, its operation being left "to the haphazard wishes" of anyone desiring to use it, which method of operation it is charged was negligent; that defendants "negligently failed to maintain any signaling device or means on said elevator to enable their customers and others to use said elevator with reasonable safety;" and that defendants, knowing said alleged negligent custom or method of operation, negligently failed to inform plaintiff thereof and warn him that the elevator was likely to be moved. The case was submitted to the jury on the theory of such alleged negligent "custom and practice" of defendants and other tenants so to move the elevator "without the use of any signal or warning thereof" and defendants' failure to inform or warn plaintiff of such custom.

The elevator was "an ordinary electric freight elevator," operated by means of a cable, by pulling which the person using it could move and stop it. There was a locking device by which the cable could be held so that it could not be pulled and the elevator caused to move while so locked. The elevator was not in charge of a regular operator. The various tenants used it as their needs required, operating it themselves. It had no signaling device. The only evidence as to the custom or method of operation was the testimony of plaintiff's witness, Harrison. He said that when anybody wanted to use the elevator the custom was to go to the shaft and call out "elevator" in a real loud voice, "and if nobody objected they used it;" that so far as he knew such custom was always followed.

Plaintiff said he had never been in the place before and did not

know how the elevator was operated. Neither he nor his fellow workmen asked or received any instructions or information concerning the operation of the elevator. Plaintiff said he did not notice the locking device, though from a photograph in evidence it appears to be plainly visible. Such further facts, if any, as may be necessary will be given in the course of the opinion.

The circuit court sustained defendants' motion for new trial on three stated grounds, viz: first, that the verdict was excessive; second, that the court had erred "in giving instructions of plaintiff and refusing instructions of defendants;" third, "because the evidence indicates that plaintiff was guilty of contributory negligence which bars his recovery." We take up the last stated ground first.

■ We are forced to the conclusion that, under his own evidence, it clearly appears that plaintiff was guilty of negligence which caused or directly contributed to his injury. He knew the location of the elevator shaft. There was ample light. He admits that had he "stopped and looked" he could have seen that the elevator was not at that floor. It is clear from his testimony that he could have looked and seen even without stopping. If, when he backed from the basement into the areaway, he had but glanced sideways over his shoulder toward the elevator shaft, the door of which was open and only a few steps from him, he must have seen that the elevator was not there. The locker was not a heavy load for two men, weighing, according to one of plaintiff's witnesses, about fifty or seventy-five pounds. Another witness for plaintiff testified that he could have carried it alone. Plaintiff was not without experience with freight elevators. He knew that they "move up and down." He had worked one or two years at Proctor & Gamble's, where there was a freight elevator which, as he knew, was used "on any floor." It is true he said in that connection, that at that place "we had automatic gates and every time the elevator moved from one floor there would be a gate drop down." But he did not say that he thought there was or might be such "automatic gate" at the elevator in question. or that he relied on the presence of such gate. Instead, his testimony indicates that he relied on an "understanding" that the elevator was to remain at the basement floor until loaded. In this connection he testified: "Q. If you had looked around before you took that step (the step which carried him into the shaft) you could have seen that shaft, couldn't you? A. Yes, sir, if we stopped and investigated, but our understanding was that the elevator was to be spotted." There is nothing in the evidence to indicate that such "understanding" could have been based upon anything other than pure assumption or supposition. No one had told plaintiff or his fellow workmen, or otherwise indicated to them, that the elevator would remain at the basement floor. Evidently

they simply *assumed* that it would. Moreover, as to "automatic gates," plaintiff had come down on the elevator, had seen the door which opened from the elevator shaft into the areaway, and must have observed that it was the only door or "gate" there. It appears clear to us that plaintiff simply backed heedlessly into the elevator shaft without looking, when he could and should have looked and when to look was to see.

. The case before us is, we think, similar in principle, and except in one respect, similar in its facts, to State ex rel. Cox v. Trimble, 312 Mo. 322, 279 S. W. 60. In that case the plaintiff was delivering milk at the defendant's place of business. There was a platform, on a level with the floor of the defendant's room in which the milk was to be delivered, at which platform farmers delivering milk unloaded cans of milk and then took them into the building. Just inside the door there was an elevator, the platform of which, when at that floor, formed part of the floor. When at the basement the top of the elevator would be two inches above the level of the floor and could be walked over. It appeared from the plaintiff's evidence that he knew the elevator could be raised to an upper floor, but on prior occasions he had never found it so raised. He "never gave it a thought" whether the elevator did or did not run to the upper floor. On the occasion in question he was in a hurry and he opened the screen door, just inside of which was the elevator opening, assuming that the elevator was there, and, without looking, swung his milk can in and stepped inside himself. The elevator was not there and he fell to the basement and was injured. He was held guilty of contributory negligence as matter of law. As in the instant case, there was ample light and had he looked he could have seen that the elevator was not where he supposed it to be. The only substantial difference between that case and this is that in the former case there was a screen door between the unloading platform and the elevator opening, which the plaintiff had to and did open. That door is spoken of in the opinion as a guard. The elevator shaft is spoken of as a "guarded elevator shaft," because of said screen door. In the instant case there was no such guard, but plaintiff knew that, having but a short time before come down in the elevator and having found—and left—the door to the shaft open. In State ex rel. v. Trimble, 312 Mo. 1. c. 334, 279 S. W. 60, it is said, quoting from 9 Ruling Case Law, 1257; "Every person, whether a trespasser, licensee or one present by invitation, when using . . . or when in proximity to an elevator or its shaft, is bound to exercise reasonable care for his safety." Though an elevator shaft may not be, as has been said of a railroad track, in itself a "signal of danger," still it seems to us that a person of ordinary prudence and information should know,—as plaintiff did

know—that an elevator, serving several floors in a busy building, may not remain where he left it, and that he cannot safely *assume,* without any sort of promise or assurance, that it will do so.

In Bonanomi. v. Purcell, 287 Mo. 436, 230 S. W. 120, the plaintiff stepped into an elevator shaft' without noticing that the elevator was not there and was injured. The place was dark, but he knew where the elevator shaft was, having come down on the elevator about an hour and a half before. He had no reason to believe that the elevator was still there except the fact that he had come down on it and it had stopped at that floor. He simply assumed that it remained there. He was held guilty of contributory negligence.

In Sodomka v. Cudahy Packing Co., 101 Neb. 446, 163 N. W. 809, the plaintiff, a seventeen year old boy, fell into an elevator shaft and was injured. The court thus succinctly states the facts:

"The plaintiff, in the performance of his duties, undertook to take a two-wheel truck by way of the elevator from the first floor to the third floor. He went to the elevator with his truck, and rang for the third floor. He opened the door of the elevator, and then turned his face to the truck, and when he heard the elevator come up he backed into the shaft, supposing that the elevator had stopped; but the elevator had gone on up to the next floor, and so he fell and hurt himself. He relies upon a custom to call the elevator by a certain number of rings indicating the floor at which it is to stop. The evidence shows that the elevator went to the next floor above. The plaintiff says the custom was, when the elevator man was not intending to stop the elevator where it is called, that the elevator man should notify him that he was going up higher, and he relied upon this custom, and so did not look to see whether the elevator had stopped or not."

The court held that he was guilty of gross negligence, barring recovery, and in so holding said:

"It is difficult to see how one could be guilty of more gross negligence than to back into an elevator shaft without looking to see where he was going. His relying upon a custom when nature had given him eyes is not excusable."

For other illustrative cases where persons were injured by stepping into elevator shafts or like openings without taking care to see that it was safe to do so, see the following: Marshall v. United Rys. Co. (Mo.), 209 S. W. 931; Gray v. Levy (Mo. App.), 48 S. W. (2d) 20; Ballou v. Collamore, 160 Mass. 246, 35 N. E. 463; Taylor v. Du Pont Bldg. Corp. (Del.), 99 Atl. 284; Evans v. Orttenburger, 242 Mich. 57, 217 N. W. 753; Silver v. Hause (Pa. Sup. Ct.), 131 Atl. 668; Pentz v. Wetsman, 269 Mich. 496, 257 N. W. 735; Rice v. Goodspeed Real Est. Co., 254 Mich. 49, 235 N. W. 814.

Appellant cites several cases in support of his contention that the question of contributory negligence was for the jury. The one perhaps most nearly in point is Unrein v. Oklahoma Hide Co., 295 Mo. 353, 244 S. W. 924. In that case Unrein, an employee of the defendant, was killed by a descending elevator in the basement of the defendant's building. There were no eyewitnesses to the accident. Evidently Unrein, who had come down on the elevator, had wheeled a truck he was using into the elevator shaft, the bottom of which was nearly flush with the basement floor, thinking that the elevator was there, and had sat down on his truck, waiting for the elevator to go up. It is deducible from the evidence that he thought he was on the elevator platform. The elevator, apparently without his knowledge, had been taken to an upper floor. As it came down again it crushed him. In the opinion stress is laid on the absence of automatic gates, required by an ordinance which had been pleaded and introduced in evidence. But it was also shown that the light about the elevator shaft in the basement was insufficient to enable Unrein to see that the elevator was not there. In that respect we think the Unrein case distiguishable from the case at bar, and also in at least one other respect, viz., Unrein being dead (the suit was brought by his widow), and there having been no eyewitness to the accident, the presumption was indulged, absent evidence to the contrary, that he was exercising due care for his own safety. In the instant case such presumption does not obtain, the actual facts being shown by the evidence, and, as we have said, there was sufficient light to have enabled plaintiff to see if he had looked.

Another case cited is Anzer v. Humes-Deal Co., 332 Mo. 432, 58 S. W. (2d) 962. The question of contributory negligence is very briefly treated in that case. From the "somewhat meager evidence" it appeared that the deceased, a workman, had entered the elevator and placed some tools on the elevator floor, and had told the elevator operator to wait as he had some more tools, and as he was backing off the elevator to get the other tools, the operator, suddenly and without warning, started the elevator upward without noticing the deceased's action or position. The elevator was being used only to convey workmen from floor to floor. It was contended that it was negligence for the deceased to back from the elevator platform to the floor when he could have turned round so as to be able to see. This court merely said of that contention that it was negligence for the operator, when he was told that the deceased did not have all his tools and was not ready to ascend, to start the elevator suddenly and without warning and without noticing the position of the deceased or what he was doing, and "whether deceased was guilty of negligence in backing toward the edge of the elevator floor . . . instead of turning round, was, we

think, a question for the jury under the scant evidence of the record.'' The case is clearly distinguishable. It does not appear from the opinion that the elevator operator made any response when the deceased told him to wait, but silence may give assent and the deceased may reasonably have expected that his request would be complied with and that the operator would not, suddenly and without warning, start the elevator while he was in the act of getting off of it. Other cases cited by appellant on this point are also distinguishable on the facts. In several there was insufficient light, as in the Unrein case. We deem it unnecessary to review them.

Another reason assigned by the circuit court for sustaining the motion for new trial was that the verdict is excessive. On this ground, were there no other, the action of the court would have to be affirmed. Prior to bringing this suit plaintiff had settled with the owner of the building, receiving $1500, which the jury in this case was directed to deduct from the amount of damages it might find plaintiff had sustained, and presumably did so. It returned a verdict for $23,500. That makes a total of $25,000.

Both bones of plaintiff's left leg, between the knee and the ankle, were broken. Those fractures have not healed well. The union is a "fibrous," instead of a solid, "bony" union. The leg is somewhat "bowed" and is permanently weakened, "somewhat disabling" plaintiff and probably incapacitating him for heavy manual labor requiring weight to be thrown on that leg. That imperfect union is particularly noticeable in the larger bone of the leg, and is, in the opinion of plaintiff's experts, permanent. But the leg is by no means wholly useless. Plaintiff now walks without a cane, though for a year after the accident he had to use two crutches, then one, and then for a time a cane. His back was hurt, and for two weeks or so pained him severely, but there is no evidence of any permanent injury to the back. Plaintiff's right ankle was dislocated and there was a fracture of a bone in the right heel, but those injuries seem to have left no permanent, substantial disability except that the ankle is somewhat stiff and sometimes gives plaintiff "some pain," —"change of weather and working on it gives me some pain through the joint." Plaintiff's doctor testified, "He has some enlargement of the right ankle, due I think largely to capsulary thickening. The reduction and healing of the fracture in the right ankle went on all right." The only substantial permanent injury shown is that to the left leg. Plaintiff suffered much pain, as one naturally would with such injuries.

Because of the disposition of the case we are making on other grounds, we have but sketched briefly the evidence as to the nature and extent of plaintiff's injuries. We have heretofore held that the trial court has large discretion in setting aside verdicts it deems

excessive and that this court will not interfere unless an abuse of discretion on the part of the trial court is manifest. [Dietrich v. Cape Brewery & Ice Co., 315 Mo. 507, 286 S. W. 38, 44. See, also, Morrell v. Lawrence, 203 Mo. l. c. 381, 101 S. W. 571, 575; Walthall v. St. Louis Pub. Serv. Co. (Mo. App.), 66 S. W. (2d) 177, 179, et seq.] No abuse of discretion on the part of the trial court appears in the instant case.

Considerable space in the briefs of both parties is devoted to the question of whether or not defendants should have anticipated that plaintiff might be injured by the elevator and owed to him, an invitee, the duty to warn him of the custom of operating the elevator and that it might be moved while he was away from it. We need not discuss or decide that question or questions as to the propriety of the instructions, in view of our holding on the issue of contributory negligence.

The order of the circuit court sustaining the motion for new trial is affirmed and the cause is remanded. *Westhues* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.