OLGA A. DITSCH, RESPONDENT, v. KANSAS CITY POWER & LIGHT CO., APPELLANT.—128 S. W. (2d) 1055.

Kansas City Court of Appeals. May 8, 1939.

1164

*Johnson, Lucas, Landon, Graves & Fane* for appellant.

*Homer A. Cope, Cope & Hadsell* and *Walter A. Raymond* for respondent.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $3000, and defendant has appealed.

The facts show that plaintiff was injured on December 27, 1937, when she fell through a trapdoor in her residence in Kansas City, which door had been left open by a meter reader employed by the

1166

defendant. Plaintiff, at the time of her injury, was fifty-nine years of age. She had lived in the house for a great many years. It consisted of two stories, containing six rooms, a bath, two halls and a basement. It had three rooms on the first floor and three on the second. The house faced east. The kitchen was at the back. The kitchen was thirteen feet, eight inches east and west and eleven feet, three inches north and south. There was a window in the north and one in the west wall of the kitchen. There was a porch on the south side of the kitchen which had a door at its west end leading to the outside. There also was a door in the south wall of the kitchen leading to the porch, the upper half of which was glass. The porch was enclosed, two feet of the top being of glass, the remainder of wood. There were voile pin-dot curtains on the door and the windows of the kitchen. These curtains were red with rose colored dots. In addition to the curtains these openings had olive-green shades. There were two electric lights in the kitchen; one in the middle of the ceiling, which was operated by a switch on the east side of the wall between the kitchen door, leading to the front part of the house, and the pantry, and one over the sink on the south wall, which was operated by a pull chain. There was a pantry adjoining the kitchen to the east; the north wall of the pantry being on a line with the north wall of the kitchen. There was a solid wooden door leading from the kitchen into the pantry. This door opened toward the kitchen and, when open, it rested against the north wall of the kitchen. There was a "six foot" icebox standing against the north wall between the window in the kitchen and the pantry door. There was barely enough room between the icebox and the pantry for the door to open against the wall. This door was two feet, four inches wide. The pantry, itself, was two feet, four inches north and south and six feet east and west. The entire floor of the pantry consisted of a trapdoor which, when raised, permitted entry into the basement by means of a flight of steps. The place between the kitchen door and the west edge of the trapdoor consisted of only the width of a threshold board under the pantry door. The trapdoor opened from the south and against the north wall. The north wall of the pantry consisted of dark colored panel boards and were of the same color as the trapdoor. The stairway to the basement consisted of ten steps. There was a window on the north wall of the pantry two feet wide and four feet high. On this window there was an olive-green shade and a pink and white striped gingham curtain. The only artificial light in the pantry was an electric light located in the ceiling about the middle of the pantry. This light was operated by means of a drop-cord. In order to operate it, it was necessary for a person to take two or three steps out on the trapdoor. About five inches inside of the pantry, and on the south wall thereof, was a switch which operated the light in the basement. One could reach in and operate this switch without stepping upon the

trapdoor. The plaintiff in going into the pantry for any purpose would not turn on the basement light for the reason that when the trapdoor was down it was of no aid in entering or using the pantry.

When plaintiff decided to go to the basement she would turn on the basement light first, then open the trapdoor. After she would turn on the basement light and open the trapdoor she could see the light from the basement and was enabled therefrom, alone, to tell that the trapdoor was open.

On the day of plaintiff's injury the sky was over-cast. No sunshine occurred in the daylight period. It was a cloudy, dreary and very dark day. The kitchen lights were not turned on during the morning. The window and door shades were drawn half way. About eleven o'clock of that morning plaintiff's sister came to visit her. About twenty minutes before twelve o'clock, noon, plaintiff went into the pantry to get a box of crackers and a can of soup for lunch for herself and sister. Plaintiff knew where the soup and crackers were so she did not turn on the pantry light when she went into get them. When standing on the threshold, preparing to enter the pantry, she could tell that the trapdoor was closed.

After procuring the soup and crackers, plaintiff and her sister sat at a small table in the center of the kitchen, eating lunch. Plaintiff sat on the south facing north and her sister was on the east facing west. About twenty minutes after plaintiff had been in the pantry and about 12 o'clock, noon, defendant's electric light meter reader, one Holman, came to the rear door. Plaintiff got up from the table, opened the door and let the meter reader in. She observed that he was not the regular meter reader and in response to his inquiry as to how to get to the basement, plaintiff pointed to the pantry door and he started toward it. Plaintiff testified: "When he opened the door he stood on the threshold. I said, 'You will have to step back because that is a trapdoor. You will have to raise that from the inside.' And he did and went on down and that is all that was said, and I said after that before he went down, I said, 'Will you please close the trapdoor.' Q. You told him that before he went down? A. Yes, sir. And I said there was also a light there he could turn on if he wished. He said, 'I have a flashlight.' " Plaintiff further testified that she did not know whether he turned on the light; that she observed that the trapdoor and the pantry door were open when he went down to read the meter; that while the meter reader was in the basement the front door bell rang and plaintiff went to answer it; that the caller was a peddler with whom plaintiff talked four or five minutes; that when she returned to the kitchen the pantry door had been closed; that her sister informed her that the meter reader had gone; that plaintiff did not see him go.

Plaintiff further testified that she and her sister finished lunch and plaintiff started to take the crackers bank into the pantry; that plain-

tiff looked as she opened the pantry door and it looked the same as when she was in there before and, as before, the trapdoor appeared to be down; that she believed it to be down; that it was dark in the pantry. When she was asked whether her body in the doorway had a tendency to shut off the light, she stated: ''Well, I believe so, yes, sir.'' She testified that she did not anticipate that the meter reader would leave the trapdoor up; that ''I thought sure he had closed it because I had told him so;'' that she did not attempt to turn on the basement light; that she took a step into the pantry and fell down the basement steps to the floor of the basement, receiving severe injuries. Plaintiff's sister's back was to the pantry door and she was not in a position to see whether the meter reader closed the trapdoor when he came out of the basement. No one else was in the kitchen, pantry or the basement between the time he arrived and the time plaintiff attempted to enter the pantry to replace the crackers.

When plaintiff's sister heard the commotion of plaintiff's falling and her outcry she rushed to the pantry, but it was so dark, she could not see whether the trapdoor was up or down. Hearing plaintiff moaning in the basement she reached into the pantry and turned on the basement light, when she, for the first time, could see that the trapdoor was open against the north wall.

The electric light meter reader, testifying for the defendant, stated that he closed the trapdoor and the pantry door after coming up from the basement before he departed from the house.

In this connection defendant says that plaintiff's own ''evidence does not show definitely whether she looked before she entered the pantry, because her testimony and the natural inferences to be drawn therefrom point both ways;'' that it was plaintiff's duty to look and that ''the most convincing proof of all that *she did not look* and that if she had looked she would have seen the trapdoor open is to be found in plaintiff's testimony that when she went in the pantry *to get the crackers and soup* only a few minutes before the accident she was able to and did see the trapdoor without the aid of artificial light. She said: 'Q. And as you stood there before you entered to get the crackers and soup—A (Interrupting) Yes, sir. Q. You could tell, could you, that the trapdoor was closed? A. Yes, sir. Q. There was no light burning at that time, was there? A. No, sir.' ''

In reference to looking immediately before she fell, plaintiff testified: ''As I opened the door I thought it looked the same as always because it was such a dark place, dark that day especially, I thought everything was normal as before and I went in there, and as I made just one step I went down and that is all I remember.'' . . . ''Q. Now, tell the court and jury whether or not when you entered the pantry after you opened the door, if from the look that your say you gave the pantry, it appeared the same as it did when you went in after the soup and crackers in the first place? A. It did look

to be the same. Q. Yes. Did you anticipate that the light man would leave the door up? A. I thought sure he would close it because I had told him so.''

On cross-examination, she testified: ''Q. And as you stood there before you entered to get the crackers and the soup—A. (Interrupting) Yes, sir. Q. You could tell, could you, that the trapdoor was closed? A. Yes, sir. Q. There was no light burning at that time, was there? A. No, sir.'' Her deposition was then produced and the following occurred: ''Q. (By MR. FANE): I want to ask you if Mr. Lucas asked you this question: (Reading) 'Question : But, you didn't look before you walked in there this time when you fell, did you, to see if the trapdoor was open? Answer: No, because I thought he closed it because I told him.' Now, was that question asked you and did you give that answer? A. I must have given that answer but I didn't mean it that way. He confused me so.''

After this, she was asked at the trial: ''Q. Now, Mrs. Ditsch, I want to ask you once more in view of your testimony whether or not you actually remember now that you looked? A. Yes, sir. Q. Before you stepped on that step? A. Yes, sir. Q. You remember that now? A. As much as I remember, yes, sir. Q. Pardon me? A. As much as I remember, yes sir. Q. As much as you remember? A. Yes, sir.''

There is no question but that plaintiff testified that she did look prior to going into the pantry immediately prior to the time that she fell, and that the conditions therein, in reference to the trapdoor, appeared to her to be the same as when she went in to get the soup and crackers. Defendant would have us hold, as a matter of law, that she did not look because she testified that, as she stood before the pantry prior to entering therein, when she got the crackers and soup, she could tell that the door was closed. Consequently, defendant says, that if she had looked at the time she fell, she could have told it was open.

We have concluded that the jury could have found, in view of plaintiff's testimony, taken as a whole, that what she meant to say was that, when she went in after the soup and crackers, she looked and saw that the trapdoor was down and that, when she went to put the crackers away, she looked again, standing at the same place, and that the conditions as to the trapdoor being closed, appeared to be the same on both occasions. In other words that while the light was bad, yet, there was sufficient light for her to see into the pantry and she thought that she saw the trapdoor down in place on each occasion, she being correct the first time and mistaken the second.

The evidence shows that the sum did not shine at all during the day that plaintiff was injured; that it was dark and cloudy. It is a matter of common knowledge that on a cloudy day it may be darker at times than at others and, in this instance, it may have grown mate-

rially darker between plaintiff's trip to the pantry for the soup and crackers and her later trip, when she fell. What she stated in her deposition is not conclusively binding upon her at the trial and it was within the province of the jury to have ignored it and accept as correct her testimony at the trial. [McNatt v. Wab. Ry. Co., 341 Mo. 516.] It is true, the last statement she made in reference to the matter was that she looked ''as much as I remember.'' However, we do not consider this a retraction of her testimony theretofore given at the trial when she stated that she did look, rather, we think that the jury could have concluded from all of her testimony that she meant to say that, as she remembered it, she did look.

In this connection defendant cites cases involving persons stepping into elevator shafts, thinking the elevator to be present, and the duty imposed upon such persons to look before so stepping. In this connection it is claimed by the defendant that the plaintiff should have turned on the basement light and that she had no right to assume that the meter reader had closed the trapdoor.

Elevator cases are not on all fours with trapdoor cases for the reason that an elevator has no fixed place and it may be found anywhere in the shaft while a trapdoor, such as the one in the case at bar, is designed to be ordinarily down. In view of the situation of the trapdoor in this case, it was dangerous to leave it up, anyone could see that. In one of the cases relied upon by defendant, Keeter v. DeVoe & Reynolds, 338 Mo. 978, it was said that an elevator ''moves up and down'' and that the plaintiff knew this and knew that it was used *''on any floor.''*

Even if the situation here is to be compared with an elevator shaft, the courts are not in harmony as to whether an intending passenger entering into an elevator shaft, which is open, is guilty of contributory negligence, as a matter of law, in failing to see that the cage is not at the floor when he steps through the door. Some courts hold that failure to see the absence of the cage, is contributory negligence while, others hold that it is a question for the jury to determine. Of course, the matter is one which must depend for its solution upon the circumstances involved in each particular case. Where the entrance is dark it would seem that a person, stepping into the shaft without using ordinary care to satisfy himself that the elevator is there, is guilty of contributory negligence, as a matter of law. On the other hand, if the entrance is light, it is sometimes argued that, if the intending passenger had exercised ordinary care, he would have discovered the danger. ''Between the extremes of darkness and lightness there is a middle degree of illumination. Where the elevator approach is but dimly lighted, a person may be justified in thinking that an elevator is at the floor when in fact it is absent. Under such circumstances, his contributory negligence is plainly a jury question. A passenger cannot walk blindly through an elevator door, but if a hasty and

cursory examination would lead an ordinarily prudent person to suppose that the elevator carriage is there, he is not necessarily negligent if he proceeds on that assumption.'' [9 R. C. L., p. 1258.]

In the case at bar it was not totally dark in the pantry when plaintiff fell but the evidence is such as to lead us to believe that the situation, as to light, was similar to that present and under consideration in the cases of Aiken v. Sidney Steel Scraper Co., 197 Mo. App. 673, 675, 676, and Katz v. No. K. C. Devl. Co., 14 S. W. (2d) 701, 708. In the former case the condition as to the light present was described as follows: ''It was not the light of broad day so that one could be charged with listlessly and blindly blundering into an elevator shaft;. nor was it so dark that one could know, or realize, that he could not see. But it was in that indefinable state between full light and complete darkness which permits one to see imperfectly, and frequently deceptively, as in twilight. Plaintiff's case meets that situation. [9 Ruling Case Law, 1258; Mortan v. Saks, 143 Ala. 139, 141; Noyes v. Des Moines Club, 160 N. W. 215, 218; Marshall v. United Railways, 184 S. W. 163.] He approached the elevator intending to step in and wait for Hall. He thought he saw it—the open space had exactly the appearance of the floor—and he stepped in. All prudent men will not say that a reasonable man would not have been so deceived and have acted in like manner, and that being true plaintiff's conduct should be judged by a jury.'' [See, also, Winters v. Hassenbush, 89 S. W. (2d) 546, 550; Hubenschmidt v. S. S. Kresge & Co., 115 S. W. (2d) 211.]

We have examined the cases cited by defendant and find them not in point. Keeter v. DeVoe & Reynolds, 338 Mo. 978, was an elevator case. In that case plaintiff backed into the elevator shaft without looking. The court said: l. c. 986: There was ample light and the plaintiff knew that the elevator would move up and down and knew that the elevator was used ''on any floor;'' that the plaintiff relied upon the understanding that the elevator would remain permanently at the basement floor until loaded. There is nothing in the evidence to indicate that such understanding could have been based upon anything more than pure assumption and supposition. In the case at bar plaintiff testified that she told the meter reader to put the trapdoor down.

There is nothing in the testimony indicating that he made any response to this request but plaintiff testified that she relied upon him putting it down. In the Keeter case, supra, l. c. 990, in discussing Anger v. Humes-Deal Co., 332 Mo. 432, the court said: ''It does not appear from the opinion that the elevator operator made any response when the deceased told him to wit, but silence may give assent and the deceased may reasonably have expected that the request would be complied with and that the operator would not, suddenly and with-

out warning, start the elevator while he was in the act of getting off of it." (Italics ours.)

In the case of State ex rel. v. Trimble, 312 Mo. 322, cited by defendant, plaintiff was in a hurry and opened a screen door, just inside of which was an elevator opening and assuming, but without making any effort to find out the true facts as to whether the elevator was there, and without looking he swung his milk can in and stepped inside himself. The elevator was not there and he fell to the basement and was injured. In that case plaintiff made no effort to find out whether the elevator was there. In the case at bar, plaintiff stated that she looked the best she could and it appeared to her that the trapdoor was in place.

In Sodomka v. Cudahy Packing Co., 101 Nebr. 446, plaintiff backed into the elevator shaft *without looking to see where he was going,* relying upon a custom.

In Gray v. Levy, 226 Mo. App. 991, it was said, l. c. 998: Plaintiff deliberately walked into the elevator shaft *"without looking and thereby failed to see that which was plainly visible."* (Italics ours.)

In Bonanomi v. Purcell, 287 Mo. 436, plaintiff stepped into the elevator shaft without noticing that the elevator was not there and was injured. The place was dark but he knew where the elevator shaft was, having gone down on the elevator about an hour and a half before. He had no reason to believe that the elevator was still there except the fact that he had gone down on it *an hour and a half before* and it had stopped at that floor. He simply assumed that it remained there. In the case at bar, plaintiff did not assume that the trapdoor was down but looked the best she could and relied somewhat upon the meter reader to perform his duty, after she told him to put it down when he left.

In Marshall v. United Rys. Co., 209 S. W. 931, plaintiff without looking jumped into a dark elevator shaft thinking the elevator cage was level with the floor.

In Shuck v. Security Realty Co., 201 S. W. 559, plaintiff fell into an unlighted well hole in a building which was being constructed. It was dark and plaintiff had been at the place before. He went into the building and began to descend the stairs where it was pitch dark. He felt in his pocket for a match, but finding none, proceeded down the stairway, expecting to follow the handrail, but there was none and he walked into the hole. The court inquired, l. c. 560: How could a man attempt to find steps in an unfinished building in pitch darkness, without taking the precaution to get a light, a match, if nothing else?

We have examined Swanson v. Schoenhofen Brewing Co., 215 Ill. App. 185, Heide v. Schubert, 166 Ill. App. 586, and Glombicki v. Chicago Packing Co., 212 Ill. App. 649. These cases afford no authority in this State because, in Illinois the Appellate Courts weigh the testimony. [See Slack v. Kansas City Gas Co., 120 S. W. (2d) 70.]

In Conboy v. Osage, etc. (Pa.), 135 Atl. 729, plaintiff fell down an unlighted stairway while leaving a lodge hall. The court held that upon finding the hall and stairway in darkness and getting no response to his calls for the janitor, plaintiff should have retraced his steps to the lodge room, which was but a few feet away, and from some of those there present ascertain the location of the switch which controlled the electric light. That case is unlike the case at bar. However, it is doubtful whether the Supreme Court of Missouri would have ruled as the Supreme Court of Pennsylvania did in that case. [McCloskey v. Salveter & Stewart Inv. Co., 317 Mo. 1156.]

We cannot say that plaintiff was guilty of contributory negligence, as a matter of law, because she did not feel with her foot and failed to turn on the basement light, although if she had done either, it would have disclosed that the trapdoor was open. She gave as an excuse for her failure to turn on the basement light that she was not going to the basement and it was not her habit to turn on the basement light when she would enter the pantry. We believe that these matters were for the attention of the jury in view of the fact that the basement light was not designed to be used in entering the pantry and, in this instance, it was not pitch dark therein. Plaintiff testified that she looked and it appeared to her that the trapdoor was in place. She had told the meter reader to put it down and she thought that he had done so.

However, defendant says that plaintiff is governed by the well-recognized rule that facts once shown to exist will be presumed to continue until the contrary is shown. If such rule of law is to be applied to the determination as to whether a given action of a person is contributory negligence, as a matter of law, nevertheless, plaintiff cannot be so adjudged. It is true, that the last time plaintiff saw the trapdoor, before she fell, it was up, consequently, no doubt, it was her duty to have used some care to ascertain if it was down when she attempted to return the crackers to the pantry. She did attempt to ascertain this fact by looking into the pantry. She told the meter reader to put the trapdoor down and she relied upon him doing it.

"It must be borne in mind the negligence of Blosser in turning off the light and leaving the trapdoor open created a dangerous condition; that had the light been left on or the trapdoor closed that danger would not have existed; that to say it was the duty of plaintiff to ascertain the conditions would be to say she was under duty to act upon the presumption Blosser had been negligent. She had right to believe and act upon the belief that Blosser had not been guilty of a positive wrong." [Slack v. Kansas City Gas Co., supra, l. c. 73. See also Rosella v. Paxinos (Calif.), 294 Pac. 39.]

It is insisted that there was no evidence that the meter reader left the trapdoor open. The facts, in this connection, show that there was no one in the house except plaintiff, her sister and the meter

reader and that neither plaintiff nor her sister left the trapdoor open. It is admitted that the meter reader was the last one to leave the basement and, although he testified at the trial that he put the trapdoor down, and this was the only direct testimony on the point, the jury was not required to believe his testimony but could have inferred, without basing an inference on an inference, that he left it open. [Am. Veterinary Lab. v. Glidden Co., 59 S. W. (2d) 53, 60.]

It is insisted that the defendant was not negligent, even though its employee did leave the trapdoor open. Defendant admits that this point was ruled against it in Slack v. Kansas City Gas Co., *supra,* but asks us to overrule that case. We think that that case was well considered and we adhere to our holding therein.

The judgment is affirmed. All concur.